# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| EDREES BRIDGES, | | |
| | * | |
| Plaintiff, | | |
| | * | |
| v. | | |
| | * | Civil No. 21-1319-BAH |
| PRINCE GEORGE'S COUNTY, | | |
| MARYLAND, & PRISON | * | |
| MINISTRY OF AMERICA | | |
| | * | |
| Defendant. | | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

Plaintiff, Edrees Bridges ("Plaintiff"), brought this suit against Defendants, Prince George's County ("the County") and Prison Ministry of America ("PMA" and, collectively, "Defendants"), alleging violations of his First Amendment rights under 42 U.S.C. § 1983. ECF 1. The parties have filed cross motions for summary judgment. ECFs 79, 81. The Court has reviewed Plaintiff's motion for summary judgment,[1] ECF 79, Defendants' opposition and cross motion for summary judgment, ECF 81, and Plaintiff's response and reply, ECF 86. Each motion included exhibits, which the Court has also reviewed, as well as Plaintiff's corrected appendix, ECF 85.[2] No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023). For the reasons below, Defendants' motion is DENIED and Plaintiff's motion is DENIED.

---

[1] Though Plaintiff's filing did not include a separate motion for summary judgment, but rather only a memo arguing for and requesting summary judgment, Defendant raises no issue with this filing, and the Court construes this as a motion for summary judgment. ECF 79.

[2] Plaintiff's unopposed motion to correct appendix at ECF 85 is GRANTED.

I.      BACKGROUND

The facts of this case as alleged in the complaint are laid out in detail in this Court's memorandum opinion denying Defendant's motion to dismiss at ECF 51, but as the parties have now completed discovery, it is appropriate to summarize the facts as now supported by the record. This case arises from Plaintiff's desire to apply for a paid chaplaincy position staffed through PMA at Prince George's County Detention Center ("the detention center"). ECF 1, at 2–5. Plaintiff began his relationship with the detention center in 2018, when he started volunteering to provide part-time chaplaincy services to those incarcerated there. *See* ECF 85-1, at 23. During this time, he was also working full-time as a police officer, pursuing his doctoral degree in ministry, and serving as an imam at his mosque. *Id.* at 13–18. Plaintiff's volunteering at the detention center stopped with the onset of the Covid-19 pandemic, as most outside volunteers were no longer allowed inside the detention center. *Id.* at 27–28.

When Plaintiff began volunteering at the detention center, chaplaincy services were provided through an outside contractor not a party to this suit, Good News Ministry Services. ECF 85-1, at 20. In 2021, the County, which owns and operates the detention center, instead contracted with PMA to provide chaplaincy and religious services to those housed at the detention center. ECF 81-4, at 2. This contract between the County and PMA came about through a contract-bid process. *See id.* Though PMA is an explicitly Christian organization, the contract between PMA and the County required PMA to provide one paid, non-denominational chaplain supervisor[3] and three volunteer chaplains, corresponding to the Christian, Jewish, and Muslim religions. ECF 81-3, at 23.

---

[3] This position is referred to by many names throughout the filings. *See, e.g.,* ECF 81-3 (referring to the position as the "Chaplaincy Supervisor"); ECF 85-1, at 591 (referring to the position simply as "Chaplain"). The Court will refer to it as the "chaplain supervisor" position.

As a result, when in-person activities at the detention center began to resume in 2021, PMA sought to hire the required paid chaplain supervisor and to bring the volunteer chaplains back to the detention center.  ECF 85-1, at 30, 309–310.  Mark Maciel, the president of PMA, began recruiting for the chaplain supervisor role and started reaching out to previous volunteer chaplains to resume in-person services, making calls based on a list of former volunteers that included only their names and phone numbers, not their religious affiliations.  *Id.* at 309–310, 313.  PMA and the County dispute whether and to what extent the County was involved in the hiring process for the chaplain supervisor position.  *Compare id.* at 305 (Maciel deposition attesting that PMA sent the entire job application to the County to review during the hiring process and that staff from the County sat in on interviews for the position), *with id.* at 508–10 (County designee deposition explaining that the County "didn't play any role" in the hiring of the chaplain supervisor to her knowledge and that she had never seen the chaplain supervisor application before the deposition).

On April 23, 2021, Mr. Maciel called Plaintiff to inquire if he would be interested in resuming his volunteer chaplain work at the detention center.  ECF 85-1, at 30.  When the chaplain supervisor position came up in the course of conversation, Plaintiff expressed interest in the role and requested an application.  *Id.*  At the time of the conversation, Plaintiff was considering retiring from the police force and was eager to move his career towards chaplaincy.  *Id.* at 47.

Mr. Maciel sent the application to Plaintiff later that day at Plaintiff's request.  *Id.* at 32.  A few days later, when Mr. Maciel had not yet received Plaintiff's completed application, he emailed Plaintiff to check in.  ECF 81-16, at 2.  Plaintiff, who had not yet looked at the application, responded that he would submit it by the end of the week.  *Id.*  Plaintiff never submitted the application.  ECF 85-1, at 79.

When Plaintiff began to fill out the application, he was met with several standard components. *See* ECF 85-1, at 602–04. The application asked for his work experience, education, references, and other typical employment questions. *Id.* at 603–04. The application also contained a set of questions regarding Plaintiff's faith that were specific to Christianity (e.g., use of the word "church" instead of "faith center," "temple," or "mosque"; asking about the applicant's "concern for the inmate and his personal commitment to Christ"). *Id.* at 604. This section contained an explicit notice at the top of the page that it was optional, stating, "These questions are for the leadership of Christian Chaplain Service to get to know a little about you personally and are not required answers for employment. Please leave this section blank if you are uncomfortable with anything herein." *Id.*

The next section, however, led to this lawsuit. The application next contained a "Statement of Applicant's Christian Faith." *Id.* at 197; *see also* ECF 1-2, at 5. This section contained no language that specified or suggested that it was optional. ECF 85-1, at 197. It contained several declarations explicitly affirming the applicant's Christian faith:

### STATEMENT OF APPLICANT'S CHRISTIAN FAITH

Christian Chaplain Services and Prison Ministry of America are non-profit, ecumenical Christian organizations whose purpose is to serve God under the leadership of Jesus Christ. Employees of Christian Chaplain Services and/or Prison Ministry of America are committed to a lifestyle of Christianity and agree with our statement of faith.

### Mission Statement

Prison Ministry of America is an organization bringing hope and restoration to those who have experienced incarceration, through prayer, spiritual counseling, printed materials, and Chaplaincy support.

### Statement of Faith

**We believe** in one God, Creator and Lord of the Universe, the co-eternal Trinity; Father, Son, and Holy Spirit.

**We believe** that Jesus Christ, God's Son, was conceived by the Holy Spirit, born of the Virgin Mary, lived a sinless life, died a substitutionary atoning death on the cross, rose bodily from the dead and ascended to heaven where, as truly God and truly man, He is the only mediator between God and man.

**We believe** that the Bible is God's authoritative and inspired Word. It is without error in all its teachings, including creation, history, its own origins, and salvation. Christians must submit to its divine authority, both individually and corporately, in all matters of belief and conduct, which is demonstrated by true righteous living.

**We believe** that all people are lost sinners and cannot see the Kingdom of God except through the new birth. Justification is by grace through faith in Christ alone. Those who reject Jesus Christ as their Lord and Savior in the present life shall be raised from the dead for eternal suffering and separation from God. Those who accept Jesus Christ as their Lord and Savior will be present with him for eternity in heaven.

**We believe** in one holy, universal, and apostolic Church. Its calling is to worship and witness concerning its Head, Jesus Christ, preaching the Gospel among all people groups and demonstrating its commitment by compassionate service to the needs of human beings and promoting righteousness and justice.

**We believe** in the necessity of the work of the Holy Spirit for the individual's new birth and growth to maturity; and also for the Church's constant renewal in truth, wisdom, faith, holiness, love, power, and mission.

**We believe** that Jesus Christ will personally and visibly return in glory to raise the dead and bring salvation and judgment to completion. God will fully manifest His kingdom when He establishes a new heaven and new earth, in which He will be glorified forever and exclude all evil, suffering, and death.

Without mental reservation, I hereby subscribe to the above statements.

Signature:_____ Date:_____

*Id.* (image copied directly from Plaintiff's exhibit). [4]

At the bottom of the page, a space for a signature appeared along with the text: "Without mental reservation, I hereby subscribe to the above statements." *Id.* Plaintiff, who is Muslim, felt he was unable to sign this component of the application, as he fundamentally did not subscribe to the Christian faith or the specific statements outlined in the application. ECF 85-1, at 96–98. He was "disappointed" and believed that his inability to sign this statement rendered him unable to submit a completed application. *Id.* at 51, 96–98.

Plaintiff focused his job search elsewhere and did not contact the County, the detention center, or PMA again regarding the chaplain supervisor position. ECF 85-1, at 82–83. A few months later, in August 2021, he began working as a part-time paid chaplain with the Army. *Id.*

---

[4] "Christian Chaplain Services" is the former name of PMA, under which it still does business. ECF 85-1, at 264*; see also id.*, at 411 (identifying "Christian Chaplain Services" as an "[o]ther name used by" PMA in its bid for the contract with the County).

at 120.  PMA hired another individual, Keith Lynch, for the chaplain supervisor position.  *Id.* at 174.  Mr. Lynch is a Christian and did sign the Statement of Christian Faith.  *Id.* at 175, 290.

Defendants claim that the Statement of Christian Faith was optional and that they would have considered Plaintiff's application as complete and given him full consideration had he submitted the application without signing the statement.  ECF 81-1, at 11; ECF 85-1, at 329.  PMA has since removed the statement from its chaplaincy application.  ECF 85-1, at 173 (deposition stating that PMA removed the Statement of Christian Faith from its applications in October 2021).

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'"  *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)).  "A fact is material if it 'might affect the outcome of the suit under the governing law.'"  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."  *Anderson*, 477 U.S. at 247–48 (emphasis in original).  The Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor.  *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam); *Scott v. Harris*, 550 U.S. 372, 378 (2007).  This includes "questions of credibility and of the weight to be accorded to particular evidence."  *Masson v. New Yorker Mag.*, 501 U.S. 496, 520 (1991) (citing *Anderson*, 477 U.S. at 255).  "[I]n the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate, because it is the function

of the fact-finder to resolve factual disputes, including matters of witness credibility." *Angelini v. Balt. Police Dep't*, 464 F. Supp. 3d 756, 776 (D. Md. 2020).

At the same time, the Court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 2003)). "[U]nsupported speculation is not sufficient to defeat a summary judgment motion." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987); *see also CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658–59 (4th Cir. 2020); *Williams v. Giant Food Inc.*, 370 F.3d 423, 433 (4th Cir. 2004) ("[The nonmoving party's] self-serving opinion . . . cannot, absent objective corroboration, defeat summary judgment."); *Harris v. Home Sales Co.*, 499 F. App'x 285, 294 (4th Cir. 2012) ("Although we do not make credibility determinations at the summary judgment phase, we should also not find a genuine dispute of material fact based solely on [the plaintiff's] self-serving testimony."). "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [her] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat*, 346 F.3d at 522 (quoting the pre-2007 version of Fed. R. Civ. P. 56(e)).

## III.   DISCUSSION

The parties present cross motions for summary judgment.  Defendants argue that Plaintiff does not have standing; that neither defendant is subject to § 1983 in the context of the hiring for the chaplain supervisor position; and that no violation of Plaintiff's rights occurred.  ECF 81-1, at 13–34.  Plaintiff maintains that he has demonstrated each element required to succeed on his claims and seeks damages, injunctive relief, declaratory relief, and attorneys' fees, in addition to any other relief the Court finds proper.  ECF 79, at 12–20; ECF 1, at 13–14.

**A.  Plaintiff has standing to seek damages.**

Whether a plaintiff has standing to sue is a threshold inquiry for any lawsuit.  *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 597 (2007).  It is the plaintiff's burden to establish standing.  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  To do so, a plaintiff must demonstrate that they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Id.*  "[A] plaintiff must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000).  Here, Defendants assert that Plaintiff lacks both injury and redressability.  ECF 81-1, at 13–21.

1. Plaintiff has demonstrated that he suffered an injury because he was "able and ready" to apply for the chaplain supervisor position but did not do so because of the Statement of Christian Faith.

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Spokeo*, 578 U.S. at 339.  "[A]fter *Spokeo*, a plaintiff may not satisfy the strictures of Article III by alleging 'a bare procedural violation, divorced from any concrete harm.'"  *Edmondson v. Eagle Nat'l Bank*, 344 F.R.D. 72, 76–77 (D. Md. 2023) (citing *Spokeo*, 578 U.S. at 341).  "[A] grievance that amounts to nothing more than an abstract and generalized harm to a citizen's interest in the proper application of the law does not count as an 'injury in fact.'"  *Carney v. Adams*, 592 U.S. 53, 58 (2020).  The thrust of Defendants' argument that Plaintiff lacks injury is that Plaintiff was not "able and ready" to apply for the chaplain supervisor position because he took no additional steps to apply after reading the Statement of Christian Faith.  ECF 81-1, at 14–17.  For the reasons that follow, this argument fails.

When a plaintiff alleges unconstitutional discrimination in hiring, they need not "translate [their] desire for a job into a formal application where that application would be merely a 'futile

gesture.'" *Carney*, 592 U.S. at 66 (cleaned up) (quoting *Teamsters v. United States*, 431 U.S. 324, 365–66 (1977)).  Instead, they need only demonstrate that they were "able and ready" to apply and that "a discriminatory policy" prevented them from doing so on equal footing with their competitors.  *Gratz v. Bollinger*, 539 U.S. 244, 262 (2003) (quoting *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. Jacksonville*, 508 U.S. 656, 666 (1993)); *see also Carney*, 592 U.S. at 60 (applying "able and ready" test in First Amendment context).  A determination of whether a plaintiff was indeed "able and ready" is a fact-specific inquiry that focuses on whether the plaintiff was "likely to apply . . . in the reasonably foreseeable future" were it not for the discriminatory policy.  *Carney*, 592 U.S. at 63.

Defendants argue that Plaintiff here is analogous to the plaintiffs in *Carney v. Adams*, 592 U.S. 53 (2020) and *Menders v. Loudon County,* 65 F.4th 157 (4th Cir. 2023).  ECF 81-1, at 14–15.  The plaintiff in *Carney*, a Delaware lawyer who was a registered Independent, challenged a provision of the Delaware constitution that required that judicial appointments to Delaware courts maintain a partisan balance between the Democratic and Republican Parties.  *Carney*, 592 U.S., at 55–57.  The plaintiff claimed that the requirement violated his First Amendment right to freedom of association by making him ineligible to become a judge unless he registered as a member of one of the major parties.  *Id.*  The Supreme Court held that the plaintiff lacked standing to challenge the requirement because he was not "able and ready" to apply for a judgeship, and thus had no injury.  *Id.* at 66.  The *Carney* plaintiff's "few words of general intent" stood "without reference to an anticipated timeframe, without prior judgeship applications, without prior relevant conversations, without efforts to determine likely openings, without other preparations or investigations, and without any other supporting evidence." *Id.* at 63.

Similarly, in *Menders*, the Fourth Circuit dismissed for lack of standing the plaintiffs' First and Fourteenth Amendment challenges to a program at their children's schools that sought to "amplify the voices of Students of Color and those who have experienced or witnessed injustices, marginalization, or discrimination." 65 F.4th at 159, 166. The Fourth Circuit found that, "like the lawyer in *Carney*," the plaintiffs in *Menders* "ha[d] not alleged facts that show their children were 'able and ready' to participate in" the challenged program because the plaintiffs did not allege that their children were actually prevented from participating in the program, that their children had applied to participate in the program, or even that their children *wanted* to apply to the program. *Id.* at 163. Thus, the plaintiffs lacked standing. *Id.* at 166.

Defendants attempt to equate the utter lack of interest shown by the plaintiffs in *Carney* and *Menders* in the programs challenged in those cases with Plaintiff's failure to submit his completed application in this case. ECF 81-1, at 16–17. This comparison falls short. Unlike the plaintiffs in *Carney* and *Menders*, Plaintiff here actually sought out the application for the chaplain supervisor position with the intent to apply. ECF 85-1, at 30–32. He requested the application directly from Mr. Maciel as soon as he heard of the position. *Id.* And though Defendants assert that Plaintiff "was not actively seeking employment as a jail chaplain" when he requested the application, such an assertion is undercut by the record. ECF 81-1, at 16. Plaintiff was actively pursuing a doctoral degree in ministry (on top of the Master of Divinity degree he already possessed) at the time he requested the application, and he already had several years of experience as a volunteer chaplain at the very correctional institution at which he sought to apply to work. ECF 85-1, at 17, 19–20, 158. Indeed, when Mr. Maciel asked Plaintiff about the status of his application before Plaintiff had reviewed the application and seen the Statement of Christian Faith,

Plaintiff responded that he intended to submit his application by the end of the week.  ECF 85-1, at 606.

There is no reason to believe that a man with higher education in both chaplaincy and criminal justice, who had experience volunteering as a chaplain at correctional facilities and other institutions, and who went on to become employed as a chaplain just months later was for any reason not seriously interested in applying for the chaplain supervisor role at the detention center when he requested the application.  In direct contrast to the plaintiffs in *Carney* and *Menders*, the context here offers ample support for the assertion that Plaintiff was "ready and able" to apply for the position.  *Cf. Carney*, 592 U.S. at 63 (finding that "the context offer[ed] [the plaintiff] no support" when he had no "actual desire to become a judge").  That Plaintiff did not actually submit his application does not defeat his injury, as the record demonstrates that he was "ready and able" to apply, and that he likely would have done so in the foreseeable future had it not been for the Statement of Christian Faith.  *See* ECF 85-1, at 606 (email from Plaintiff to Mr. Maciel that he intended to submit his application by the end of the week before Plaintiff became aware of the Statement of Christian Faith).

That Defendants' claim that the Statement of Christian Faith was not actually required does not change this analysis.  The Statement of Christian Faith indicated, on its face, that Plaintiff's application would be futile based on his religion, and Plaintiff did not apply as a result, despite being otherwise "ready and able" to do so.  *See Int'l Brotherhood of Teamsters*, 431 U.S. at 366 (holding that an individual who does not submit an application based on clear indications that such an application would be futile due to discrimination is "as much a victim of discrimination as is he who goes through the motions of submitting an application").  Plaintiff's understanding on this point was facially reasonable given that one of the other components of the application—the

"Personal Data" section—was explicitly labeled as optional, suggesting that all components that lacked such a notice were required.  As the Supreme Court has made clear, the presence of a clear indicator that people with a certain characteristic need not apply is itself sufficient to confer injury to those who are otherwise willing and able to apply, without considering any nuances behind the employer's motivation in displaying such an indicator.  *See id.* at 365.

Thus, Plaintiff has met the injury requirement of standing.

2. <u>Plaintiff's claims for damages satisfy the redressability element of standing.</u>

"[T]he plaintiff must not only establish an injury that is fairly traceable to the challenged conduct but must also seek a remedy that redresses that injury."  *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 796 (2021).  To satisfy the requirements of standing, it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 755 (4th Cir. 2013) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)).  "The burden imposed by this requirement is not onerous.  Plaintiffs 'need not show that a favorable decision will relieve [their] every injury.' Rather, plaintiffs 'need only show that they personally would benefit in a tangible way from the court's intervention.'"  *Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 189 (4th Cir. 2018) (quoting *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 284 (4th Cir. 2018)).  Plaintiff here seeks injunctive and declaratory relief, as well as damages.  ECF 1, at 14.  Defendants argue that "this Court cannot redress any complaint of the Plaintiff because PMA has removed the Statement of Christian Faith and because the Plaintiff cannot prove he suffered any damages." ECF 81-1 (capitalization removed).  Because Plaintiff must establish standing for each type of relief sought, the Court addresses Plaintiff's requests for injunctive, declaratory, and monetary relief in turn.  *Friends of the Earth*, 528 U.S. at 185 ("[A] plaintiff must demonstrate standing separately for each form of relief sought.").

Declaratory and injunctive relief are appropriate to redress ongoing or future harm. *Kanuszewski v. Mich. Dep't of Health & Hum. Servs.,* 927 F.3d 396, 407–08 (6th Cir. 2019) (explaining that damages are an appropriate remedy for completed, past harm, but injunctive and declaratory relief are appropriate when there is an "allegation of a real or immediate threat" of future or ongoing injury); *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) (explaining that injunctive relief is only available when there is a "real or immediate threat the plaintiff will be wronged" in the future). Here, though Plaintiff has established injury, that injury occurred completely in the past. Defendants draw the Court's attention to a news article wherein Plaintiff claims that he no longer wishes to apply for the chaplain supervisor role. *See* ECF 81-11, at 2–5. Furthermore, PMA has already removed the Statement of Christian Faith from its application. ECF 85-1, at 171 (stating that PMA removed the Statement of Christian Faith from its applications in October 2021). As such, there is no ongoing or future harm for declaratory or injunctive relief to address, and Plaintiff does not have standing to pursue these forms of relief. *See Lyons*, 461 U.S. at 111.

The Court next considers whether Plaintiff's injury can be redressed through damages.[5] Defendants argue that Plaintiff's injury "is not enough to warrant an award of damages, beyond potentially a nominal award of $1.00, based upon a violation of his constitutional rights." ECF 81-1, at 19. Yet Defendants fail to acknowledge that "an award of nominal damages by itself can redress a past injury." *Uzuegbunam*, 141 S. Ct at 796. Indeed, in the very case on which

---

[5] Though Plaintiff does not specifically request nominal damages, he does request "[s]uch other and further relief as the Court may deem just and proper." ECF 1, at 14. Because nominal damages would fall under the broad sweep of this request, especially given Defendants' acceptance of nominal damages as a possible remedy in this case, it is appropriate to consider this remedy here. *See* ECF 81-1 (acknowledging that it is possible that Plaintiff may be awarded "potentially a nominal award of $1.00").

Defendants rely to support their argument that Plaintiff is not entitled to damages, a Fourth Circuit

panel on appeal "unanimously held that [the plaintiffs were] entitled to $1.00 in nominal damages"

to vindicate a violation of their constitutional rights with no associated compensatory damages.

ECF 81-1, at 19 (citing *Norwood v. Bain*, 166 F.3d 243 (1999)).

Nominal damages are "the damages awarded by default until the plaintiff establishes

entitlement to some other form of damages, such as compensatory or statutory damages."  *Id.* at

800.   Because Plaintiff here would be entitled to nominal damages if a violation of his

constitutional right is shown, the redressability element of standing is satisfied.   The Court need

not consider whether Plaintiff is entitled to compensatory damages, as nominal damages alone

satisfy the standing requirement for monetary relief.  *See Keister v. Bell*, 29 F.4th 1239, 1256–57

(11th Cir. 2022), *cert. denied*, 143 S. Ct. 1020 (2023) (holding that nominal damages "check[] the

redressability box" in a § 1983 case); *Hammons v. Univ. of Md. Med. Sys. Corp.*, 551 F. Supp. 3d

567, 577–78 (D. Md. 2021) (finding that "redressability [] is easily met" when plaintiff sought

nominal damages for completed violation of a legal right).

Thus, Plaintiff has satisfied the requirements of standing for his claims seeking damages.

**B.  § 1983 Analysis**

"To state a claim under § 1983, a plaintiff must allege [1] the violation of a right secured

by the Constitution and laws of the United States, and [2] must show that the alleged deprivation

was committed by a person acting under color of state law."  *West v. Atkins*, 487 U.S. 42, 48

(1988).

1.  Applicability of § 1983 to Defendants

"The traditional definition of acting under color of state law requires that the defendant in

a § 1983 action have exercised power 'possessed by virtue of state law and made possible only

because the wrongdoer is clothed with the authority of state law.'"  *West*, 487 U.S. at 49 (quoting

*United States v. Classic*, 313 U.S. 299, 326 (1941)).  "To constitute state action [actionable under

§ 1983], 'the deprivation must be caused by the exercise of some right or privilege created by the

State . . . or by a person for whom the State is responsible.'"  *Id.* at 49 (quoting *Lugar v. Edmondson*

*Oil Co.*, 457 U.S. 922, 937 (1982)).  In essence, "[t]he party charged with the deprivation must be

a person who may fairly be said to be a state actor."  *Id.* (quoting *Lugar*, 457 U.S. at 937).  "[A]

public employee acts under color of state law while acting in his official capacity or while

exercising his responsibilities pursuant to state law," *id.* at 50, and a state contractor may also be

liable as a state actor under § 1983 if their actions are "fairly attributable to the State," *Rendell-*

*Baker v. Kohn*, 457 U.S. 830, 838 (1982) (quoting *Lugar*, 457 U.S. at 937).  "What is fairly

attributable is a matter of normative judgment, and the criteria lack rigid simplicity."  *Brentwood*

*Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001).  Local governments

and municipalities are "included among those persons to whom § 1983 applies," but "a

municipality cannot be held liable under § 1983 on a *respondeat superior* theory."  *Monell v. Dep't*

*of Soc. Servs. of N.Y.*, 436 U.S. 658, 690–91 (1978).

> i.  *PMA was a state actor under § 1983 during the hiring process for the*
> *chaplain supervisor position.*

The Fourth Circuit has recognized four situations in which a private party acts under color

of state law:

> (1) when the state has coerced the private actor to commit an act that would be
> unconstitutional if done by the state; (2) when the state has sought to evade a clear
> constitutional duty through delegation to a private actor; (3) when the state has
> delegated a traditionally and exclusively public function to a private actor; or (4)
> when the state has committed an unconstitutional act in the course of enforcing a
> right of a private citizen.

*DeBauche v. Trani*, 191 F.3d 499, 507 (4th Cir. 1999).  This case concerns the delegation of a

constitutional duty to a private contractor.  "[I]f the state delegates its obligations to a private actor,

the acts conducted in pursuit of those delegated obligations are under color of law." *Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 342 (4th Cir. 2000).

It is undisputed that PMA is a contractor of the County. *See* ECF 81-1, at 21–24 (discussing PMA as a contractor of the County); ECF 79, at 15–16 (same). Plaintiff argues that "prison contractors are considered state actors," including chaplains, and PMA is thus a state actor. ECF 79, at 15 (quoting *Ortega v. Hall*, Civ. 5:19-cv-1, 2020 WL 4196009, at *2 n.3 (S.D. Ga. July 2, 2020), *report and recommendation adopted*, 2020 WL 4060555 (July 20, 2020)). Defendants counter that PMA is a private actor, and that "there is no constitutional obligation to provide chaplains for inmates," and therefore, "Plaintiff cannot argue that the County has outsourced any constitutional obligation to PMA thereby subjecting PMA or the County to liability." ECF 81-1, at 23 (citing *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1929 (2019)).

A private entity may be a state actor in some functions but not others. *See Bell v. Mgmt. & Training Corp.*, 122 F. App'x 219, 222–23 (6th Cir. 2005) (explaining that it is "uncontroversial" to note that "[a]n entity may be a state actor for some purposes but not for others" (quoting *George v. Pac.–CSC Work Furlough*, 91 F.3d 1227, 1230 (9th Cir.1996))). While Defendants are correct that "[c]ourts have [] cautioned against considering a prison chaplain to be a state actor" in the chaplain's actual ministry work, this caution extends only to "conduct undertaken by a prison chaplain acting purely in a clerical capacity." *Montano v. Hedgepeth*, 120 F.3d 844, 850 (8th Cir. 1997). The hesitance to label a chaplain a state actor when the chaplain performs ministry work does not extend beyond the provision of religious services; "the administrative and managerial tasks [a chaplain] is required to perform as prison chaplain . . . clearly would be fairly attributable to the state." *Id.* at 851. As such, the administrative functions, such as hiring staff, of a contractor to whom a correctional facility has delegated the provision of

services are analyzed in the same manner as the acts of any other contractor.  The question, then, is whether PMA was acting in pursuit of a constitutional duty delegated to it by the County when it created the application packet containing the Statement of Christian Faith and sent that application to Plaintiff.

"[R]easonable [opportunities] must be afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendment without fear of penalty."  *Cruz v. Beto*, 405 U.S. 319, 322 n.2 (1972).  Incarcerated individuals "have restricted or even no access to religious services unless government takes an active role in supplying those services.  That role is not an interference with, but a precondition of, the free (or relatively free) exercise of religion by members of these groups."  *Johnson-Bey v. Lane*, 863 F.2d 1308, 1312 (7th Cir. 1988).  Indeed, "[p]rison officials [] are *required* to facilitate opportunities for prisoners to worship or otherwise exercise religious beliefs."  *Brown v. Collier*, 929 F.3d 218, 244 (5th Cir. 2019) (emphasis in original).  As a result, "[p]rison employment of [] chaplains to assist inmates in their religious exercise is a permissible accommodation within the established parameters of the First Amendment."  *Hartmann v. California Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1126 (9th Cir. 2013).  Thus, though prisons are not constitutionally required to employ chaplains specifically, they are constitutionally required to facilitate the free exercise of prisoners' religion, and employing chaplains is one of the most widely accepted methods to do so.

Here, the County sought to contract with PMA to "provide religious services to the inmates" at the detention center.  ECF 81-3, at 22.  In so doing, the County delegated at least a portion of its duty under the First Amendment to enable the free exercise of religion for those incarcerated in their care.  The hiring of the chaplain supervisor was done in service of that duty.  *See* ECF 81-3, at 22–23.  Thus, PMA was "delegated a public function" by the County that

comprised part of their constitutional duty. *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001). As such, PMA is subject to § 1983 liability for its actions in carrying out that delegated duty, such as the hiring of the chaplain supervisor.

> ii.   *There is a dispute of material fact as to the County's liability under § 1983.*

It is well established that "[c]ounties and other local governments cannot be held liable under § 1983 for injuries inflicted by their employees or agents based on [the] theory of *respondeat superior*." *Borkowski v. Balt. Cnty.*, 414 F. Supp. 3d 788, 813 (D. Md. 2019) (citing *Monell*, 436 U.S. at 690). There are four ways in which a municipality may be liable under § 1983:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (quoting *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999)). Put another way, "municipal liability results only 'when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.'" *Spell v. McDaniel*, 824 F.2d 1380, 1385 (4th Cir. 1987) (quoting *Monell*, 436 U.S. at 692–94).

Plaintiff argues that "[w]hen a municipality delegates core government power—which would presumably include the power to hire individuals for government positions—to a third party and fails to exercise any oversight over that third party, it effectively makes the third party the entity with final policymaking authority." ECF 79, at 16. As a result, Plaintiff argues, the municipality is then "subject to *Monell* liability for that entity's constitutional violations." *Id.* In support of this position, Plaintiff cites to *Spell v. McDaniel*, 824 F.2d at 1390–91, 1397. ECF 79, at 16. In *Spell*, the Fourth Circuit considered a case involving a police officer's use of excessive

force and whether the municipality was liable for the officer's unconstitutional conduct.  824 F.2d at 1383–86.  Recognizing the near impossibility of proving the existence of an explicit policy authorizing an unconstitutional use of excessive force, the court held that a municipality may be liable for "deficient programs of police training and supervision which are claimed to have resulted in constitutional violations by untrained or mis-trained police officers" or "irresponsible failure by municipal policymakers to put a stop to or correct a widespread pattern of unconstitutional conduct by police officers of which the specific violation is simply an example."  *Id.* at 1389.  The Court addresses each of these theories of liability in turn.

First, for the County to be liable under a theory of deficient training or supervision, there must be "a specific deficiency rather than general laxness or ineffectiveness in training," and that deficiency must "make the specific violation almost bound to happen, sooner or later, rather than merely likely to happen in the long run."  *Id.* at 1390 (internal quotation marks and citation omitted).  In *Spell*, there was evidence presented that the police chief, an authorized policymaker for the municipality, instituted a training program that "was specifically deficient in its express or tacit encouragement of uses of excessive physical force . . . ; that this deficiency resulted from the deliberate indifference of [the police chief] and his authorized subordinates . . . ; [and] that as a direct result of the deficient training which he had received under this training policy, [the defendant police officer] brutally assaulted and injured plaintiff Spell."  *Spell*, 824 F.2d at 1395.

The facts of the County's involvement here are a far cry from those in *Spell*.  Though PMA was itself required to provide training to its volunteers, ECF 81-3, at 23, there is no suggestion that the County provided any substantial training to PMA.  *See* ECF 85-1, at 494–95 (explanation from County employee about minimal oversight of PMA by County).  In fact, the only clearly established communication between the County and PMA regarding the County's hiring practices

explicitly includes anti-discrimination policies.  ECF 85-1, at 692.  Thus, the County cannot be held liable under a theory of deficient training.

The question of whether the County can be held liable for PMA's conduct as part of a "condoned custom or usage," however, is more difficult.  *Spell*, 824 F.2d at 1395.  For the County to be liable under a theory of failure to correct an unconstitutional "custom or usage," policymakers at the County must have had "actual or constructive knowledge" of the existence of such a custom. *Spell*, 824 F.2d at 1391.  In *Spell*, the municipality was liable for a police officer's use of excessive force when that use of force was "in specific accord with and in furtherance of [the] condoned custom or usage" of excessive force.  *Id.*  In coming to this conclusion, the court considered evidence that the police chief was aware of ongoing excessive force incidents and condoned and covered up those incidents.  *Id.*

Here, the extent of the County's involvement in the hiring of the Chaplain Supervisor is disputed.  While PMA asserts that the County saw the application during the hiring process, sat in on the interviews for the position, and had a say in the selecting the final candidate,  ECF 85-1, at 305, the County denies any involvement in the hiring of the chaplain supervisor, claiming that they were not even aware that PMA included the Statement of Christian Faith in the chaplain supervisor application until the filing of this lawsuit, ECF 85-1, at 508–11.  Furthermore, it is unclear exactly with whom at the County and to what extent PMA allegedly discussed the hiring process and application.  *See* ECF 85-1, at 302–04 (PMA deposition referencing "Mr. Bearstop,"[6] "Ms. Hill," and "Shelly Johnson" as County employees who were in some way involved in hiring but

---

[6] The County asserts that Dr. Gregory Bearstop, the division chief for inmate services, bore ultimate responsibility for overseeing PMA's partnership with the County, but the record does not indicate what his actual involvement with PMA was, or even what his involvement with PMA was intended to be.  *See* ECF 85-1, at 494, 499, 500–01.

providing little additional detail).  While Plaintiff asserts that "the County participated in the hiring decision" for the chaplain supervisor potion, ECF 79, at 9, a claim supported by the deposition of PMA's president, Mr. Maciel, the County's insistence that it was not involved creates a dispute of material fact with respect to the County's liability for PMA's actions under § 1983.

Because there is a genuine issue of material fact regarding the County's involvement in the hiring of the chaplain supervisor, it would be inappropriate to grant summary judgment on the claims against the County.

    2.   <u>There are disputes of material fact regarding whether Plaintiff's First Amendment rights were violated.</u>

The First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."  The courts have interpreted this portion of the First Amendment to convey two related rights protecting the freedom of religion: the establishment clause and the free exercise clause.  *Cantwell v. Connecticut*, 310 U.S. 296, 303–04 (1940).  Both clauses have been incorporated to apply to the states through the Fourteenth Amendment.  *Sch. Dist. of Abington v. Schempp*, 374 U.S. 203, 215 (1963) (citing *Cantwell*, 310 U.S. at 303).  Plaintiff claims that Defendants violated his First Amendment rights under both the establishment and free exercise clauses.

    *i.   Establishment clause*

The establishment clause ensures, among other protections, that neither the Federal nor State government "can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion.  No person can be punished for entertaining or professing religious beliefs or disbeliefs." *Everson v. Bd. of Educ.*, 330 U.S. 1, 15–16 (1947); *see also Torcaso v. Watkins*, 367 U.S. 488, 495 (1961) ("[N]either a State nor the

Federal Government can constitutionally force a person 'to profess a belief or disbelief in any religion.'").

*Torcaso v. Watkins* is particularly instructive here.  In that case, the Supreme Court struck down as unconstitutional under the establishment clause a provision of the Maryland Declaration of Rights that required that any individual appointed to public office declare a belief in God.  367 U.S. at 492–96.  The Court held that any such test requiring a religious oath in order to hold government employment was undoubtedly "abhorrent to our tradition."  *Id.* at 491 (quoting *Girouard v. United States*, 328 U.S. 61, 69 (1946)).

This case bears a striking resemblance to *Torcaso*.  Here, as in *Torcaso*, Plaintiff was confronted with a religious oath as a barrier to working at a government institution.  367 U.S. at 495–96.  Though Defendants claim that the religious oath presented in the application was optional, the fact that a job application presented by a state actor ostensibly required Plaintiff to "subscribe" to a Statement of Christian Faith closely mirrors the "religious test" in *Torcaso*. *Torcaso*, 367 U.S. at 489 (overturning law that required public employees to "declar[e] of belief in the existence of God").  Even if Defendants argue that Plaintiff should have contacted Defendants to ask them whether he could apply for the position despite his inability to sign the Statement of Christian Faith, a reasonable jury could still find that the inclusion of the Statement of Christian Faith in the application was a state actor's impermissible attempt to force Plaintiff "to profess a belief or disbelief in any religion." *Torcaso*, 367 U.S. at 495.  Because a reasonable jury could find the Statement of Christian Faith to be "a religious test" like the one in *Torcaso*, summary judgment cannot be granted in favor of Defendants on this count.  However, Defendants' assertion that the Statement was optional creates a sufficient dispute of material fact as to render summary judgment inappropriate in Plaintiff's favor, as well.

ii.   *Free exercise clause*

The free exercise clause "means, first and foremost, the right to believe and profess whatever religious doctrine one desires." *Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 877 (1990) (emphasis in original) (internal quotation marks and citation removed). Furthermore, the free exercise clause "protects against 'indirect coercion or penalties on the free exercise of religion, not just outright prohibitions.'" *Carson as next friend of O. C. v. Makin*, 596 U.S. 767, 778 (2022) (quoting *Lyng v. Nw. Indian Cemetery Protective Assn.*, 485 U.S. 439, 450 (1988)).

"[A] plaintiff may carry the burden of proving a free exercise violation in various ways, including by showing that a government entity has burdened his sincere religious practice pursuant to a policy that is not neutral or generally applicable." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022) (citation omitted). "A government policy will not qualify as neutral if it is specifically directed at religious practice. A policy can fail this test if it discriminates on its face, or if a religious exercise is otherwise its object." *Id.* (cleaned up) (internal citations omitted). To demonstrate that one's "sincere religious practice" has been burdened, a plaintiff must show that the government policy or practice in question "significantly inhibit[s] or constrain[s] conduct or expression that manifests some central tenet of a person's individual religious beliefs; [] meaningfully curtail[s] a person's ability to express adherence to [their] faith; or [] den[ies] a person reasonable opportunity to engage in those activities that are fundamental to a person's religion." *United States v. Ali*, 682 F.3d 705, 709–10 (8th Cir. 2012) (citation omitted). Once a plaintiff makes such a showing, the burden then shifts to the defendant to prove that its policy satisfies the demands of "strict scrutiny" through "demonstrating its course was justified by a

compelling state interest and was narrowly tailored in pursuit of that interest." *Kennedy*, 597 U.S. at 525 (citing *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 546 (1993)).

Here, PMA employed a policy of including the Statement of Christian Faith in its employment applications.  ECF 85-1, at 170–71.  Regardless of whether the Statement of Christian Faith was mandatory or not, the inclusion of such a statement, especially given that it appeared on its face to be required, clearly employed a non-neutral policy as it specifically allowed for participation by Christians and no others.  This non-neutral practice, then, could be viewed by a reasonable jury as placing a burden on Plaintiff's religious expression by denying him the ability to apply for a job that he otherwise would have been able to seek, due to his religion.  Nowhere does Defendant even attempt to argue that the inclusion of the Statement of Christian Faith was narrowly tailored to meet a compelling government interest.  *See* ECF 81-1, at 29–31.  As such, a reasonable jury could find that this burdened Plaintiff's freedom of expression and that the policy was not narrowly tailored to meet a compelling government interest, and thus summary judgment cannot be granted in favor of Defendants.  However, the question of whether the inclusion of the Statement of Christian Faith in the application burdened Plaintiff's religious exercise, given Defendants' assertion that the Statement of Christian Faith was not actually required, creates a genuine dispute of material fact, and, therefore, summary judgment cannot be granted in favor of Plaintiff, either.

## IV.    CONCLUSION

For the reasons above, genuine disputes of material fact exist with respect to both of Plaintiff's claims.  Accordingly, Plaintiff's motion for summary judgment is **DENIED** and Defendants' motion for summary judgment is **DENIED**.

Dated: <u>February 1, 2024</u>                          <u>                    /s/                    </u>
                                                        Brendan A. Hurson
                                                        United States District Judge